Augustus **BLOUNT** et al., Plaintiffs-
Appellants,

v.

**PEERLESS CHEMICALS (P.R.) INC.**,
and **Peerless Oil & Chemical Corp.**,
Defendants-Appellees.

Nos. 27263, 27623.

United States Court of Appeals
Second Circuit.

Argued March 28, 1963.

Decided April 15, 1963.

George J. Engelman, New York City, and James T. Smith, Baltimore, Md., for plaintiffs-appellants.

Patrick E. Gibbons, of Terhune, Gibbons & Mulvehill, New York City (Urban S. Mulvehill, New York City, of counsel), for defendants-appellees.

Before WATERMAN and KAUFMAN, Circuit Judges, and BRYAN, District Judge.

KAUFMAN, Circuit Judge.

This is a consolidated appeal from two orders, one in the District Court for the Southern District of New York, and the other in the District Court for the Eastern District of New York, vacating service and dismissing the complaint against defendant-appellee, Peerless Chemicals (P.R.) Inc., a Puerto Rican corporation. The action, first brought in the Southern District, is founded upon personal injuries suffered by plaintiffs, Baltimore longshoremen, aboard the S.S. Frances in Baltimore Harbor, and alleged to have resulted from the escape of chlorine gas from certain supposedly empty chlorine cylinders owned and shipped by Peerless Chemicals (P.R.) Inc., hereinafter referred to as Peerless (P.R.). Jurisdiction rests upon diversity of citizenship, 28 U.S.C. § 1332. Judge MacMahon vacated service upon Dennis J. Carey, Jr., president of Peerless (P.R.), effected at the Long Island City offices of the parent corporation, Peerless Oil and Chemical Corp., hereinafter referred to as Peerless. He also dismissed the complaint against Peerless (P.R.), finding that it was doing no business within the state of New York and that any possible inferences to the contrary indicate at best that business is being conducted in the Eastern District, where the offices of the parent are located. Plaintiffs then filed their complaint in the Eastern District. Judge Dooling held, after considering a lengthy deposition of Peerless (P.R.) through its president Dennis Carey, that the corporation was doing no business in New York, and that the court was therefore without jurisdiction.

We are thus confronted with the question whether Peerless (P.R.) was "doing business" in New York, more specifically in Long Island City, such that a federal court sitting in New York may assert jurisdiction over it in the particular circumstances of the case before us.

■ Whether the standard of "doing business" for federal diversity cases is that of the state in which the federal court sits, or is a distinct federal standard, was resolved by this Court in an alternative holding in Jaftex Corp v. Randolph Mills, 282 F.2d 508 (2d Cir. 1960); there, over the dissenting voice of Judge Friendly, Judges Lumbard and Clark decided that a federal standard, apparently congruent with that set down in International Shoe Co. v. Washington, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945), should apply. This Court is presently reconsidering this problem *in banc*, in the case of Arrowsmith v. United Press International (appeal from 205 F. Supp. 56 (D.Vt.1962)). The outcome of that case is of no moment here, because both parties have agreed that this Court should apply the International Shoe test—fashioned there not as a federal jurisdictional standard, but as a constitutional limitation upon the exertion of state judicial power—which is thought to be more permissive than the prevailing New York jurisdictional test, see Tauza v. Susquehanna Coal Co., 220 N.Y. 259, 115 N.E. 915 (1922). It is true that parties cannot, by consent, confer jurisdiction on the federal courts, but that too is of no moment, for we hold that the Puerto Rican corporation was not, even under International Shoe, doing sufficient "business" in New York, and

we therefore affirm the dismissal of the complaints in both the Southern and Eastern District Courts.

## I.

The Supreme Court's approach to the question of personal jurisdiction over a foreign corporation is revealed not only in International Shoe but also in such more recent cases as Perkins v. Benguet Consolidated Mining Co., 342 U.S. 437, 72 S.Ct. 413, 96 L.Ed. 485 (1952), and Hanson v. Denckla, 357 U.S. 235, 250–255, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958). See generally Kurland, "The Supreme Court, the Due Process Clause and the In Personam Jurisdiction of State Courts", 25 U. of Chi.L.Rev. 569 (1958); "Developments in the Law—State-Court Jurisdiction", 73 Harv.L.Rev. 909, especially 919–35 (1960); Note, "Jurisdiction Over Foreign Corporations—An Analysis of Due Process", 104 U. of Pa. L.Rev. 381 (1955). One concludes from a study of the foregoing that the two fundamental factors determinative of the propriety of personal jurisdiction appear to be the nature and extent of the business activities conducted by and on behalf of the foreign corporation in the forum state, and the relationship to that state and those activities of the cause of action upon which suit is founded. Thus, a corporation which expends money, time, and effort extensively within a state, thereby exercising the privilege of dealing with its residents, may receive considerable economic benefit; when its activities are given protection by state law, it ill behooves the corporation to complain about appearing there to litigate. See Hanson v. Denckla, 357 U.S. at 253, 78 S.Ct. at 1239; International Shoe Co. v. Washington, 326 U.S. at 319,

66 S.Ct. at 159. Similarly, the state has an interest in subjecting to its judicial process a corporation whose activities in that state expose its residents to a risk of physical harm or economic loss; the state's interest in regulating such objectionable conduct within its borders is apparent even though the plaintiff may be a nonresident; and the propriety of exercising jurisdiction is more obvious when the plaintiff is a resident. See McGee v. International Life Ins. Co., 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957); Perkins v. Benguet Consolidated Mining Co., supra; Travelers Health Ass'n v. Virginia, 339 U.S. 643, 70 S.Ct. 927, 94 L.Ed. 1154 (1950).[1]

The court must apply these factors to the particular circumstances of the case before it, see MacInnes v. Fontainebleau Hotel Corp., 257 F.2d 832, 833 (2d Cir. 1958), in order to determine whether it is "reasonable, in the context of our federal system of government, to require the corporation to defend the particular suit which is brought" in the forum. International Shoe Co. v. Washington, 326 U.S. at 317, 66 S.Ct. at 158. Another factor—although in large measure a reformulation of the two basic ones just set out—is the so-called "balance of conveniences" of the parties in conducting the lawsuit in a given forum. Ibid. See Hutchinson v. Chase & Gilbert, 45 F.2d 139, 141 (2d Cir. 1930) (L. Hand, J.). But we have been recently reminded by the Supreme Court that jurisdiction cannot be conferred solely because of the relative convenience of the parties; restrictions upon personal jurisdiction "are more than a guarantee of immunity from inconvenient or distant litigation. They are a consequence of territorial limitations on the power of the

1. These considerations have been formulated in a somewhat different manner in the lucid concurring opinion of Judge Woodbury in W. H. Elliott & Sons Co. v. Nuodex Products Co., 243 F.2d 116, 124 (1st Cir.), cert. denied, 355 U.S. 823, 78 S.Ct. 30, 2 L.Ed.2d 38 (1957): "I think we should weigh on the one hand the legitimate interests of the state, 1) in providing local access to compensation for wrongs done to its citizens, and, 2) in regulating potentially harmful activity within the state, as against, on the other hand, the legitimate interests of the foreign corporation relative, 1) to its reasonable expectations as to the laws and liabilities to which it was subjecting itself, and, 2) to its opportunity to defend itself without undue expense and inconvenience."

respective States. However minimal the burden of defending in a foreign tribunal, a defendant may not be called upon to do so unless he has had the 'minimal contacts' with that State that are a prerequisite to its exercise of power over him." Hanson v. Denckla, 357 U.S. at 251, 78 S.Ct. at 1238.

## II.

With these principles of law in mind, we turn to the facts of this particular case. These facts have already been set out with meticulous care in the opinion of Judge Dooling, and need not, therefore, be repeated here in detail. His findings are clearly supported by the record. In determining whether Peerless (P.R.) had business contacts with New York of such a nature and extent as to warrant the conclusion that it was "present" or "doing business" here, Judge Dooling evaluated the relationship between the Puerto Rican corporation and its New York parent, Peerless, as well as between that corporation and its president, who resides in New York.

Judge Dooling found, and we agree, that

> "Peerless (P.R.) is in no sense a department or agency of Peerless New York. Its business is distinct in composition and location and it has its own operating personnel. * * * Equally, it does not appear that Peerless New York was the agent or implement of Peerless (P. R.) The parties were free to choose their forms of doing business with each other and there is no indication that they violated the integrity of the forms they chose or rendered them unreal by any course of conduct shown in the evidence."

Although Peerless (P.R.) was in effect wholly owned by Peerless of New York, the evidence is quite clear that the relationship of the New York corporation to the Puerto Rican corporation was primarily that of seller to purchaser, and not that of puppeteer to puppet. Peerless (P.R.) purchased property and erected its plant in Ponce, Puerto Rico, for the purpose of marketing and distributing chemicals and petroleum products. The New York corporation had been doing a similar business since 1945. Peerless made no loans to Peerless (P.R.), guaranteed none of its obligations, and underwrote none of its liabilities. Peerless is one of several suppliers of chemicals to Peerless (P.R.), supplying it with 10% of its purchases by tonnage and 30% in dollar value, and charging the same price charged all other purchasers. Orders are sent by Peerless (P.R.) from Puerto Rico to all suppliers and invoices are paid by checks drawn on its Puerto Rican bank. Marketing of its products is solely by local solicitation in Puerto Rico. Peerless (P.R.) pays no taxes to the State of New York, has no employees here, no telephone listing here, and is not authorized to do business here.[2]

In this case, we do not have a foreign corporation which "buys merchandise, in a systematic and continuing fashion, through an exclusive purchasing agent with an established and permanent place of business in New York," [3] Sterling Novelty Corp. v. Frank & Hirsch Distributing Co., 299 N.Y. 208, 212, 86 N.E. 2d 564, 566, 12 A.L.R.2d 1435 (1949), or an employee group soliciting sales on a regular basis, see International Shoe Co. v. Washington, supra; Jaftex Corp. v. Randolph Mills, Inc., 282 F.2d 508 (2d Cir. 1960); Nash-Ringel, Inc. v. Amana Refrigeration, Inc., 172 F.Supp.

2. It is difficult to overlook the striking similarity between the facts of this case and the facts in A. G. Bliss Co. v. United Carr Fastener Co., 116 F.Supp. 291 (D. Mass.1953) (dismissal for lack of jurisdiction over Canadian corporation), affirmed on the opinion of the District Judge, 213 F.2d 541 (1st Cir. 1954).

3. It has long been settled that purchases alone, though carried on regularly, are not enough to confer jurisdiction upon the courts of the state in which the purchases are made. Rosenberg Bros. Co. v. Curtis Brown Co., 260 U.S. 516, 43 S.Ct. 170, 67 L.Ed. 372 (1923); Hutchinson v. Chase & Gilbert, 45 F.2d 139 (2d Cir. 1930).

524 (S.D.N.Y.1959); Ronson Art Metal Works, Inc. v. Brown & Bigelow, Inc., 104 F.Supp. 716 (S.D.N.Y.1952), or a firm within the forum state which performs for the foreign corporation such an overwhelming portion of its business that the latter "has achieved most of the advantages which would accrue if the corporation performed the activity itself," see Note, 104 U. of Pa.L.Rev. 381, 402 (1955)—factors which singly or in combination might justify the exercise of jurisdiction over a foreign corporation.

The appellants refer us to cases in which the parent corporation has been held subject to the jurisdiction of another state because of the activities there of its subsidiary, see, e. g., State of Maryland for use of Mitchell v. Capital Airlines, Inc., 199 F.Supp. 335 (S.D.N.Y. 1961); and they urge, therefore, that the converse should hold true. In order to evaluate this argument, it is necessary to determine the rationale for the exercise of jurisdiction in appropriate cases over the parent of a local corporation, for we know that the mere existence of a parent-subsidiary relationship is not alone sufficient. See Cannon Mfg. Co. v. Cudahy Packing Co., 267 U.S. 333, 336, 45 S.Ct. 250, 69 L.Ed. 634 (1925); Echeverry v. Kellogg Switchboard & Supply Co., 175 F.2d 900, 903 (2d Cir. 1949). First, the parent's control over the subsidiary may be such that it is deriving considerable profit from the subsidiary's activities within the forum state; as we have already noted, the state's extension of protection to those activities may render it fair and reasonable that the parent submit to jurisdiction there. Second, control over the subsidiary and its personnel and records in the forum state may render it convenient for the parent to defend there. Jurisdiction over the parent therefore becomes unfair to the extent that the independence of the local subsidiary is a reality. See Note, 104 U. of Pa.L.Rev. at 403–06, and the cases there discussed. In the converse situation, which we have before us, Peerless (P.R.) is so much an effectively independent corporate entity—certainly not in a position conveniently to defend an action here—that to subject it to judicial process in the state of New York under the circumstances of this case would be to impose an unconstitutional burden.

### III.

■ Appellants also contend that the activities in New York of president Dennis Carey rendered Peerless (P.R.) amenable to the jurisdiction of the District Court. We find this contention without merit. The facts as amply set out by Judge Dooling reveal, in effect, that Carey, a resident of New York and president of both Peerless New York and Peerless (P.R.), remained here the greater part of the year but was in constant liaison with the Puerto Rican corporation. He decided, at the Long Island City offices of Peerless New York, questions of corporate concern, investigated into market and price conditions, sometimes signed checks drawn on the Puerto Rican bank account of Peerless (P.R.), and on a few occasions was the object of solicitation by certain manufacturers of chemicals. But he solicited no sales in New York and signed no contracts here in behalf of Peerless (P.R.). In short, the far greater proportion of Carey's activities in New York as president of the Puerto Rican corporation was related to *intra*-corporate affairs, rather than to business dealings with residents of New York, which seems to be one of the elements fundamental to the invocation of the "doing business" standard. See Hurley v. Wells-Newton Nat. Corp., 49 F.2d 914, 919 (D.Conn.1931) (Hincks, J.). The less the activities of a foreign corporation are devoted to systematic dealings with "outsiders" within the forum state, the less likely is it that the corporation has reaped benefits and protection from the laws of that state, and the less appropriate is the assertion of judicial jurisdiction. To hold otherwise would subject a foreign corporation to jurisdiction in any state in which its president, who we would expect to be constantly concerned with the well-being

of his corporation, happens to reside. In the case before us, the day-to-day operations of the corporation, its dealings with other persons by purchases, payments, solicitation, and sales, were all conducted in Puerto Rico, where its plant and employees were located. So too, in fact, were the greater number of "internal" functions, such as the holding of meetings of the board of directors, compare Pickthall v. Anaconda Copper Min. Co., 73 F.Supp. 694 (S.D.N.Y.1947), the retention of the corporate books and records, the payment of salaries to all corporate employees.[4]

## IV.

Thus, the nature and extent of the Puerto Rican corporation's business activities in New York—through its president and through its parent corporation—are insufficient to warrant subjecting it to the jurisdiction of courts sitting in this state. Despite this, there are cases, as we have already indicated, where jurisdiction may properly be exercised if the cause of action relates in some significant manner to the forum state or the business activities, however minimal, conducted in it, see International Shoe Co. v. Washington, 326 U.S. at 318, 66 S.Ct. at 159; Hanson v. Denckla, 357 U.S. at 251, 78 S.Ct. at 1238; especially if the injured party is a resident, see McGee v. International Life Ins. Co., 355 U.S. 220, 223, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957); Travelers Health Ass'n v. Virginia, 339 U.S. 643, 648, 70 S.Ct. 927, 94 L.Ed. 1154 (1950). In the case before us, injury was caused in Baltimore Harbor to the plaintiffs, all residents of Baltimore, Maryland, by the leakage of chlorine gas from cylinders supposedly emptied by Peerless (P. R.) in Puerto Rico and sent to Baltimore for refilling. The negligence charged by the plaintiffs was apparently lack of due care in Puerto Rico in removing the chlorine gas from the cylinders before shipment. In no way were the interests of New York, either qua governmental authority or qua protector of its residents, affected or impaired by the transaction on which suit is brought. The appellants tell us, however, that the cylinders were originally purchased from Peerless of New York, that it was named for convenience as consignor on the bills of lading when the cylinders plied their course between Baltimore Harbor and Puerto Rico and was designated in the arrival notice on the return trip. We believe this has no relevance to the plaintiffs' claim of injury. New York's contacts with the cause of action are far too tenuous to merit subjecting the foreign corporation to suit here.[5]

4. The most recent authoritative case cited to us by the appellants is the Supreme Court's decision in Perkins v. Benguet Consolidated Mining Co., 342 U.S. 437, 72 S.Ct. 413, 96 L.Ed. 485 (1952). The Court there upheld the jurisdiction of an Ohio court, 155 Ohio St. 116, 98 N.E.2d 33, over a Philippine corporation which was "carrying on in Ohio a continuous and systematic, but limited, part of its general business," while the Philippines were occupied by enemy troops. During the enemy occupation, the president of the corporation made Ohio the base of his operations on its behalf. Directors' meetings were held in Ohio, the corporate bank accounts and business files were kept there, stock transfers were effected there, salaries paid and machinery purchased there. The differences between Perkins and the case before us are too clear to warrant further discussion.

5. We cannot help but note, in passing, the increasing flexibility in the criteria set down in recent opinions for determining the jurisdictional question with which we are dealing. This has been mirrored—for much the same reasons, compare McGee v. International Life Ins. Co., 355 U.S. at 222–223, 78 S.Ct. at 200–201—by a similar erosion in the once formalistic doctrines of conflict of laws, see Pearson v. Northeast Airlines, Inc., 309 F.2d 553, 563 (2d Cir. 1962), cert. denied, 372 U.S. 912, 83 S.Ct. 726, 9 L.Ed.2d 720 (1963), and the development of rules for choice of law strikingly similar to those for determining the propriety of judicial jurisdiction, see Traynor, "Is This Conflict Really Necessary?", 37 Texas L.Rev. 657 (1959). This parallel development has not gone unnoticed by the Supreme Court. See Hanson v. Denckla, 357 U.S. at 253–254, and at 258, 78 S.Ct. at 1242, where

We therefore affirm the orders of Judge MacMahon in the Southern District and Judge Dooling in the Eastern District vacating service upon Dennis Carey as president of Peerless (P.R.) and dismissing the complaint.

Mr. Justice Black, dissenting, noted that "True, the question whether the law of a State can be applied to a transaction is different from the question whether the courts of that State have jurisdiction to enter a judgment, but the two are often closely related and to a substantial degree depend upon similar considerations." Although there are cases in which a state may properly exert its jurisdiction over a defendant even though it has little claim to the application of its law to the merits of the dispute, the sheer implausibility in the case before us of applying New York tort law to the Maryland accident fortifies us in denying jurisdiction in a federal court sitting in New York.